**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.*<br>**BRADY FOLLIARD,** | ) ) ) ) | |
| **Relator,** | ) ) | **Civil No. 07-719 (RCL)** |
| **v.** | ) ) ) | |
| **GOVPLACE** | ) ) | |
| **Defendant.** | ) ) | |

<u>**MEMORANDUM OPINION**</u>

This matter is before the Court on supplemental briefing relating to defendant Govplace's motion for summary judgment.  Govplace's Supp. Mem. ISO its Mot. Summ. J. ("Govplace's Supp. Mem."), Sept. 25, 2012, ECF No. 168; Relator's Supp. Mem. ISO its Opp'n to Def.'s Mot. Summ. J. ("Rel.'s Supp. Mem."), Sept. 25, 2012, ECF No. 169.  Upon consideration of the parties' supplemental briefs, the defendant's prior motion for summary judgment, Def.'s Mot. Summ. J., Nov. 4, 2011, ECF No. 126, the opposition and rely thereto, and the record herein, the Court will grant Govplace summary judgment for the four product numbers in dispute.  This resolves all remaining claims in this matter, and the Court will dismiss the case with prejudice.

I.    **BACKGROUND**

Relator Brady Folliard initiated this *qui tam* suit pursuant to the False Claims Act, 31 U.S.C. §§ 3729–3733 ("FCA").  Folliard's complaint alleged that eight named defendants listed for sale and sold products under government contracts from non-designated countries, in violation of the Trade Agreements Act ("TAA"), 19 U.S.C. §§ 2501–2581.  The TAA requires

federal contractors to sell products made in designated countries—such as Japan or the United States—and generally prohibits federal contractors from selling goods made in non-designated countries, such as China.  All eight defendants filed motions to dismiss, which the Court granted as to six of the defendants.  *See generally United States ex rel. Folliard v. Synnex Corp.*, 798 F. Supp. 2d 66 (D.D.C. 2011).

Two defendants remained:  Government Acquisitions and Govplace.  After two summary judgment opinions, the Court dismissed all claims against Government Acquisitions, and most claims against Govplace.  *See generally United States ex rel. Folliard v. Government Acquisitions, Inc.* ("*Gov't Acq. I*"), 858 F. Supp. 2d 79 (D.D.C. 2012); *United States ex rel. Folliard v. Government Acquisitions, Inc.* ("*Gov't Acq. II*"), 880 F. Supp. 2d 36 (D.D.C. 2012).

In his Second Amended Complaint, Folliard alleges that Govplace knowingly listed for sale 23—and sold ten—products that originated in non-designated countries.  Sec. Am. Compl. ¶¶ 117–18, Oct. 13, 2012, ECF No. 37.  The Complaint listed four Counts.  The Court dismissed Folliard's claims—under Counts III and IV (Second Am. Compl. ¶¶ 138–51)—alleging a TAA violation based on the defendant's listing of products for sale.  The Court held that improper product listings unconnected with a sale are not actionable.  *Gov't Acq. I*, 858 F. Supp. 2d at 85.  Folliard's Counts I and II alleged that Govplace violated the FCA by selling products from non-designated countries.  Second Am. Compl. ¶¶ 134–41.  Since Congress amended the FCA during the period covered by the Complaint, Folliard brought two separate counts—for sales occurring before the effective date of the FCA amendment, and another for those occurring thereafter.  *Id.* Since none of the disputed claims against Govplace concerned sales occurring after the FCA's amendment, the Court granted Govplace summary judgment on Count II—which covered sales made after the effective date of amendment.  *Gov't Acq. II*, 880 F. Supp. 2d at 46.

2

The Court then granted in part Govplace's motion for summary judgment as to relator's claims, under Count I, relating to several product numbers. *Id*. at 46–48. For four Hewlett-Packard ("HP") product numbers, the Court considered whether to defer ruling pending additional discovery.

For the four product numbers in question, Govplace contended that it was entitled to judgment as a matter of law because its distributor, Ingram Micro, confirmed that the products were TAA-compliant. Govplace's Mot. Summ. J. 21–22. Govplace argued that it justifiably relied on its distributor's certification that the "Products offered by the manufacturer are compliant with the Trade Agreement Act." *Id*. In response, the relator asked to Court to defer ruling on summary judgment under Federal Rule of Civil Procedure 56(d), and requested additional discovery relating to: "(a) if [Govplace] actually relied upon Ingram Micro; (b) whether [Govplace] had information in its possession which indicated that the products sold to the Government were not TAA-compliant; and (c) whether its conduct was in reckless disregard of the truth." Rel.'s Opp'n to Govplace's Mot. Summ. J. 9, May 9, 2012, ECF No. 158.

The Court found "summary judgment to be premature regarding these [four][1] products until relator has [had] an adequate opportunity to conduct focused discovery on [Govplave's] reliance on Ingram Micro." *Gov't Acq. II*, 880 F. Supp. 2d at 47. The Court ordered the relator to "perform focused, targeted discovery for…45 days limited only to [Govplace]'s reliance on Ingram Micro's Country of Origin representations for the sale of those products and whether the products sold were, as [Govplace] claims, from the United States and Japan." Order 2, July 31,

---

[1] The Court, in a typographical error, had previously listed five product numbers in dispute. *See Gov't Acq. II*, 880 F. Supp. 2d at 47 (listing Q5403A, 41657-B21, AG052A, Q4503A, and Q5983A). In fact, there are only four product numbers in dispute—Q5403A, 416577-B21, AG052A and Q5983A. *See* Sec. Am. Compl. ¶ 117; Govplace's SUF ¶ 22; Govplace's Supp. Mem. 1 n.1; Rel.'s Supp. Mem. 1 n.1.

2012, ECF No. 162.  The Court ordered the parties to file, within 11 days after discovery concluded, "simultaneous supplemental memoranda addressing these questions only."  *Id.*

In its supplemental memorandum, Govplace argues that it reasonably relied on representations made by its IT partner Ingram Micro that the products in question were made in TAA-compliant countries.  For the relevant products, Govplace does not buy directly from HP; instead, it received products from Ingram Micro that Ingram Micro certified comply with federal contracting requirements.  Thus, Folliard cannot prove Govplace "knowingly" presented false claims to the government.

According to Folliard, Govplace had a non-delegable obligation to verify that its products were produced in TAA-compliant countries, and that Govplace had information that undermined Ingram Micro's TAA representations.  Therefore, Govplace acted in reckless disregard of the truth by not verifying Ingram Micro's representations against available HP information, and there is a disputed issue of fact regarding whether Govplace acted "knowingly."

The Court agrees with Govplace.  It will grant Govplace's motion for summary judgment for Folliard's claims pertaining to sales of product numbers Q5403A, 416577-B21, AG052A and Q5983A.  By granting summary judgment on these product numbers, the Court resolves Folliard's remaining claims and will dismiss the action with prejudice.

## II.     LEGAL STANDARD

### A.     Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The mere existence of *any* factual dispute will not defeat summary judgment; "the requirement is that there

be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original).  A

fact is material if, under the applicable law, it could affect the outcome of the case.  *Id*.  A

dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Id*.  Because "[c]redibility determinations, the weighing of the evidence, and

the drawing of legitimate inferences from the facts are jury functions, not those of a judge," the

"evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in

his favor."  *Id*. at 255.

A nonmoving party, however, must establish more than "the existence of a scintilla of

evidence" in support of its position.  *Id*. at 252.  The inferences drawn from the evidence "must

be reasonably probable and based on more than mere speculation."  *Rogers Corp. v. E.P.A.*, 275

F.3d 1096, 1103 (D.C. Cir. 2002) (citations omitted).  In addition, the nonmoving party may not

rely solely on allegations or conclusory statements.  *See Greene v. Dalton*, 164 F.3d 671, 675

(D.C. Cir. 1999).  The nonmoving party must present specific facts that would enable a

reasonable jury to find in its favor.  *Id*.  If the evidence presented is "merely colorable, or is not

significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50.

### B.    False Claims Act

A proper False Claims Act claim has three elements: (1) the defendant presented a claim

for payment or approval to the government, (2) the claim was "false or fraudulent," and (3) the

defendant acted knowing that the claim was false.  *United States ex rel. Schwedt v. Planning

Research Corp.*, 59 F.3d 196, 198 (D.C. Cir. 1995).  The defendant must provide at least some

evidence about each element to survive summary judgment.  *See United States ex rel. Hockett v.

Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 71 (D.D.C. 2007) (holding when a relator

cannot "point to a single, specific false claim" or sufficiently describe one, he has "failed to create a triable issue of fact.").

## III.  DISCUSSION

To survive summary judgment, Folliard must present evidence as to each of the FCA's elements.  *See Hockett*, 498 F. Supp. 2d at 71.  The Court will analyze each element in turn.

### A.  Did Govplace Present a Claim for Payment or Approval to the Government?

"The FCA bars false demands for payment, and false statements made to induce such payments."  *Gov't Acq. I*, 858 F. Supp. 2d at 83.  Folliard may only pursue claims connected to sales, not simply listings of items for sale.  *See, e.g.*, *CDW Tech Servs.*, 722 F. Supp. 2d at 33–36 (under FCA, relator must demonstrate existence of a false claim, not just a false statement). According to the Corrected Second Amended Complaint, Folliard alleges that Govplace sold these products on April 18, 2007 (Q5403A); April 23, 2007 (Q5403A); May 5, 2007 (Q5983A); May 16, 2007 (AG052A); and September 21, 2007 (416577-B21).  Sec. Am. Compl. ¶ 117.  For these product numbers, Govplace does not argue that it did not make sales.  The Court treats Folliard's claims as to the first element as conceded.

### B.  Was the Claim False or Fraudulent?

Under the second element, the claims submitted by Govplace must be false or fraudulent. Folliard claims that HP produced each of the disputed products in China, and that Govplace sold these Chinese-produced products to the government under contracts that required TAA compliance.  *See, e.g.*, Rel.'s Supp. Mem. 2–3; Declaration of Jeremy Albright ¶ 9 ("Albright Decl."), Dec. 15, 2011, ECF No. 134-8.

The parties dispute whether the products in question were produced in China, or in a TAA-compliant company such as the United States or Japan.  In support of its position, Folliard

submitted a declaration from Jeremy Albright, PhD, who had previously been retained as a statistical expert to provide analysis of HP sales data in *United States ex rel. Liotine v. CDW*, Civil Action 05-cv-00033-DRH-CJP (S.D. Ill.).   Albright Decl.   While analyzing data for the *Liotine* case, Dr. Albright reviewed "over 300 Excel workbooks, published by HP, from the calendar years 2000 through 2010 that summarize the countries in which Hewlett Packard products are manufactured."  *Id.* ¶ 4.   According to Dr. Albright, HP provides these worksheets "to all of its vendors for reference," including CDW and Govplace.  *Id.*   Dr. Albright compared this country of origin data from the *Liotine* litigation with the Govplace sales data from the instant case, and concluded that the four products at issue were all made in China when Govplace sold them.  *Id.* ¶ 9; *see also* Dr. Albright Report – Analysis of GovPlace GSA Sales Data ("Albright Govplace Report"), May 8, 2012, ECF No. 158-8.

Govplace disputes this, and claims that it only sold products made in TAA-compliant countries.   Govplace offers the country of origin information it received from Ingram Micro, showing that at time of the alleged sales the products were manufactured in the United States and Japan.  *See* Affidavit of Adam Robinson ¶ 12 ("Robinson Aff."), Sept. 25, 2012, ECF No. 168-1; Exs. D–J to Govplace's Supp. Mem. (Ingram Micro product lists for May 2006, June 2006, August 2006, September 2006, October 2006, January 2007, and September 2007).   These product lists, however, do not prove that the products were actually made in TAA-compliant countries.   Viewed in the light most favorable to the non-moving party, at most these product lists indicate that Ingram Micro *told* Govplace that these products were TAA compliant; they do not prove that Ingram Micro's country of origin representations were accurate.

Nonetheless, the burden is not on Govplace to prove that its products were made in TAA-compliant countries; Folliard must show that Govplace submitted false claims.  The Court has serious concerns whether Folliard could provide sufficient, admissible evidence of such.

First, Federal Rule of Civil Procedure 56(c)(4) requires that "[a]n affidavit or declaration used to…oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Dr. Albright stated that the facts in his declaration were "true and correct to the best of [his] knowledge," Albright Decl. 1, and did not state that he had personal knowledge of the facts therein.  *See*, *e.g.*, *Londrigan v. Fed. Bureau of Investigation*, 670 F.2d 1164, 1174 (D.C. Cir. 1981) (noting that the "requirement of personal knowledge by the affiant is unequivocal, and cannot be circumvented" and that "[a]n affidavit based merely on information and belief is unacceptable"); *Judicial Watch, Inc. v. U.S. Dept. of Commerce*, 224 F.R.D. 261, 265 (D.D.C. 2004) (Rule 56(e)'s personal knowledge requirement renders statements made on information and belief, facts which the affiant believes but does not know are true, insufficient) (citing *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996)); *Lopez–Carrasquillo v. Rubianes*, 230 F.3d 409, 414 (1st Cir. 2000) (affidavit submitted in opposition to motion for summary judgment which stated that "'it is correct in all its parts to the best of my knowledge'" was "insufficient as a proffer of evidence because affidavits submitted in opposition to a motion for summary judgment must be based on the affiant's personal knowledge").  Therefore, Dr. Albright's declaration may not satisfy Rule 56(c)(4)'s personal knowledge requirement, making the Court unable to consider it at summary judgment.

Second, the information Dr. Albright relied on raises questions as to this Court's jurisdiction.  According to the Affidavit of Vince McKnight, Folliard obtained Govplace sales

data pursuant to two Freedom of Information Act requests.  *See* McKnight Aff. ¶¶ 8–16, May 17, 2012, ECF No. 158-2.  Dr. Albright obtained his HP county of origin information during the *Liotine* case, and the worksheets Dr. Albright used were available to all HP vendors.  Albright Decl. ¶¶ 2–4; Albright Govplace Report 3 ("The Govplace sales data…were acquired as part of two separate FOIA requests….The HP [country of origin] data were obtained during the course of litigation in the case of *U.S. ex rel. Liotine v. CDW Government, Inc*.").  The FCA states:

> No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

31 U.S.C. § 3730(e)(4).  This public disclosure bar aims "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits," *Graham Cnty. Soil & Water Conservation District v. United States ex rel. Karen Wilson*., 559 U.S. 280, 130 S.Ct. 1396, 1407 (2010), especially "by those who learn of the fraud through public channels and seek remuneration although they contributed nothing to the exposure of the fraud," *id*. at 1408 n.16 (internal quotations and citation omitted).  Information produced in response to a FOIA request "constitutes a 'report' within the meaning of the public disclosure bar." *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1889 (2011).  Furthermore, "discovery material, when filed with the court (and not subject to protective order), is 'public[ly] disclos[ed]' in a 'civil hearing' for purposes of § 3730(e)(4)(A)'s jurisdictional bar." *United States ex rel. Springfield Railway Terminal Co. v. Quinn*, 14 F.3d 645, 652 (D.C. Cir. 1994).  Since Folliard bases an essential element of his claim on a combination of FOIA responses and previously disclosed discovery material, and he was not the original source of either set of information, there are serious jurisdictional problems to Folliard's claims.

9

Folliard depends on the Albright Declaration and Report to show that Govplace submitted false claims.[2]  Since the Court has serious concerns about the source material and admissibility of Dr. Albright's analysis, the Court could grant Govplace summary judgment on the basis that Folliard cannot prove that Govplace submitted a false claim.  This may provide independent grounds for this Court's ruling.  However, Folliard's failure to provide evidence that Govplace acted "knowingly" is more glaring, and provides the strongest grounds for granting Govplace summary judgment.

### C.      Did Govplace Act Knowing the Claim was False?

Under the FCA, a person acts "knowingly" if he "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b).  "The first element of "knowingly" goes after subjective knowledge, while the second seeks out the kind of willful blindness from which subjective intent can be inferred.  As for reckless disregard, it is 'an extension of gross negligence,' or 'gross negligence-plus,' and is not merely a proxy for subjective intent."  *United States ex rel. K & R Ltd. P'ship v. Massachusetts Hous. Fin. Agency*, 456 F. Supp. 2d 46, 61 (D.D.C. 2006) *aff'd*, 530 F.3d 980 (D.C. Cir. 2008) (*quoting United States v. Krizek*, 111 F.3d 934, 942–43 (D.C. Cir. 1997)).  "Mere negligence cannot support liability under the FCA."  *Id*; *see also United States ex rel. Bettis v. Odebrecht Contractors of California, Inc.*, 297 F. Supp. 2d 272, 277 (D.D.C. 2004) *aff'd*, 393 F.3d 1321 (D.C. Cir. 2005) ("innocent mistakes" or "negligence...are insufficient"; "the claim must be a lie").

 "While scienter under the FCA is necessarily a 'fact-intensive inquiry,' summary judgment is appropriate where plaintiff produces no evidence sufficient to support a finding of the requisite scienter."  *Id.* (*quoting United States ex rel. McCready v. Columbia/HCA*

---

[2] His conclusory statements that Govplace sold Chinese-made goods are not admissible evidence.

*Healthcare Corp.*, 251 F. Supp. 2d 114, 120 (D.D.C. 2003)).  *See also*, *e.g.*, *Odebrecht*, 297 F.

Supp. 2d at 277–78 ("[F]or a *qui tam* FCA action to survive summary judgment, the relator must

provide sufficient evidence to support an inference of knowing fraud." (internal quotation marks

and citation omitted)); JOHN T. BOESE, CIV. FALSE CLAIMS & QUI TAM ACTIONS § 2.04(c)(1) (2d

ed. 2000) ("To avoid summary judgment for the defendant, admissible, credible evidence of a

knowing false statement is required.").

### 1. *Govplace's Claim that it Reasonably Relied on Ingram Micro's Representations*

Govplace claims that it reasonably relied on country of origin representations provided to

it by its technology partner, Ingram Micro.  According to Govplace CEO Adam Robinson,

"Govplace is a small business that provides IT integration and product solutions, and delivers IT

solutions exclusively to the public sector."  Robinson Aff. ¶ 3.[3]  Beginning on or around 2003,

Govplace partnered with Ingram Micro—a Fortune 100 company that is the world's largest

technology distributor—to leverage Ingram Micro's size and resources to help administer

Govplace's GSA Schedule.  *Id*. ¶¶ 5–6.  Since about 2003, Govplace has participated in the

Ingram Micro GSA Pass Through Program, in which Ingram Micro passes on certified

information it receives from manufacturers—such as HP—to its partners.  *Id*. ¶ 7.  As described

by Ingram Micro:

> This program helps solution providers obtain Letters of Supply from
> manufacturers, a requirement to include products on a GSA Schedule.  Some
> manufacturers will support any resellers, others only selected partners.  Ingram
> Micro also helps resellers maintain their GSA contracts by regularly passing

---

[3]   The Court takes as conceded the facts asserted by Govplace regarding its participation in Ingram Micro's GSA
Pass Through Program, and facts about how that program operated.  Folliard has only offered generic, boilerplate
objections that he "lacks the information necessary to respond to th[ese] purported undisputed material fact[s]."  *See*
Pl.-Rel.'s Statement of Genuine Issues ISO his Opp'n to Govplace's Mot. Summ. J. *passim*, May 17, 2012, ECF No.
158-15.  The Court granted Folliard's Rule 56(f) request, and afforded him "an adequate opportunity to conduct
focused discovery on [Govplace's] reliance on Ingram Micro."  *Gov't Acq. II*, 880 F. Supp. 2d at 47.  After this
discovery completed, Folliard has not contested these background facts as to the business relationship between
Govplace and Ingram Micro.

through manufacturer-certified information such as updated pricing and product documentation. These notifications include all data requirements on listed products, such as *country of origin*, warranty length, Special Item Numbers, Energy Star and Section 508 information.

Ex. A to Robinson Aff. 1–2 (Ingram Micro webpage, "The Ins and Outs of GSA Contracts") (emphasis added).

Govplace claims it obtained Letters of Supply from both Ingram Micro and HP that allowed Govplace to resell HP products to the federal government and participate in the Ingram Micro GSA Pass Through Program. *See* Govplace's Statement of Undisputed Facts ("Govplace SUF") ¶ 8, Dec. 2, 2011, ECF No. 129; Robinson Aff. ¶ 6. Pursuant to these Letters of Supply, Govplace regularly received HP product lists from Ingram Micro. Robinson Aff. ¶ 10. These product lists contain tens of thousands of HP products sent to participants in the Ingram Micro HP Pass Through Program. *Id.* Several of the transmittal emails Ingram Marco sent to Govplace included the following statement: "Ingram Micro passes through the following manufacturer certifications: …Products offered by the manufacturer are compliant with the Trade Agreements Act." *See* Exs. C & D to Govplace's Mot. Summ. J., Dec. 2, 2011, ECF Nos. 129-4 & 129-5; *see also* Robinson Aff. ¶ 11. Before and after the five alleged sales at issue, Govplace received country of origin information from Ingram Micro stating that product numbers 416577-B21, Q5403A, Q5983A, and AG052A were manufactured in the United States and Japan. *See* Robinson Aff. ¶ 12; Exs. D–J to Govplace's Supp. Mem.

Govplace argues that even if the products it sold were manufactured in China, it reasonably relied on the country of origin representations provided to it by Ingram Micro. As the CEO of Govplace testified during his deposition:

When Govplace was assessing working with Ingram Micro as our source for TAA compliance information, among other things, in support of our government contract program, we spent quite a lot of time with Ingram Micro working to

12

understand the underlying processes and procedures and strategies that they used to be able to ensure TAA compliance.

*   *   *

Govplace had a two-person team that was responsible for, among other things, contracts compliance.  So as part of building a growing company, we were looking for resources to make sure that we were able to adhere to compliance in an effective way with our OEMs.  So we did a careful due diligence process which included extensive conversation[s] with management over at Ingram Micro, as well as working with their team, as well as talking to our OEM partners to make sure that we understood how they went about validating TAA compliance. Based on the outcome of that due diligence process, we – we decided that the most effective way for us to ensure TAA compliance inside the business was to go through and rely upon Ingram Micro, who was at the time the distributor that we could find or the source that we could find that was willing to provide us with direct – direct information and they're willing to stand behind that information.

Deposition of Adam Robinson 30:12–19, 34:12–35:10, Sept. 12, 2012, ECF No. 168-2.

### 2.  *Folliard's Argument that Govplace's Reliance Was not Reasonable*

In his Supplemental Memorandum, Folliard argues that even if Govplace relied on Ingram Micro's country of origin representations, Govplace was deliberately ignorant or acted in reckless disregard of the truth.  Folliard argues that "GovPlace had a non-delegable duty to provide the Government with TAA-compliant goods" and "retained the obligation to verify the veracity of general statements contained in a sales email."  Rel.'s Supp. Mem. 10.  Folliard claims that Govplace had direct access to HP country of origin information, but never consulted this readily available information to verify the information provided by Ingram Micro.  *Id*. at 11. During the period of limited discovery, Govplace produced product lists it received from HP and Tech Data.  As characterized by Folliard, "GovPlace's own internal country of origin information data shows critical inconsistencies regarding the origin of the disputed products." *Id*.  at 10.  The HP and Tech Data charts list the HP product numbers as being manufactured in non TAA-compliant countries.  As Folliard agues: "Regardless of any representations made by

Ingram Micro, inconsistencies within GovPlace's own files, appearing on more than one occasion, should have spurred GovPlace to consult the manufacturer data.  GovPlace's apparent refusal to do so was reckless."  *Id.* at 12–13.

### 3. *Govplace Reasonably Relied on Ingram Micro's Representations and Did Not Need to Independently Verify the Country of Origin Information*

Folliard does not dispute that Govplace relied solely on Ingram Micro's representations about the country of origin for the disputed product numbers.  The issue, then, is whether Govplace's could rely on these representations without being deliberately ignorant or in reckless disregard of the truth.  It is important to remember that the standard under the FCA is not negligence, or even gross negligence.  It is not enough to say that Govplace had a duty only to sell TAA-compliant products, or that it would be negligent not to verify the information provided by Ingram Micro.  In order for Govplace to "knowingly" present a false claim, its actions must amount to "gross negligence-plus."  *Krizek*, 111 F.3d at 943.

First, the Court will consider whether it was gross negligence-plus, deliberate ignorance, or reckless disregard for Govplace never to check the Ingram Micro country of origin certifications against the available HP-provided information.  For now, the Court will put aside whether Govplace should have verified the Ingram Micro certifications after receiving potentially contradictory information.

Govplace argues that it did not need to check Ingram Micro's representations; it justifiably relied on what Ingram Micro said.  Govplace states:

> Govplace's reliance on Ingram Micro is comparable to the reliance of Hamilton Securities Group, Inc. ('Hamilton') on the expertise of its subcontractors in *United States ex rel. Ervin and Assoc., Inc. v. The Hamilton Sec. Grp., Inc.*, 298 F. Supp. 2d 91 (D.D.C. 2004) ('[*Ervin I*]')."  In [*Ervin I*], Hamilton was awarded a contract to "assist HUD in developing and implementing a pioneer program to dispose of HUD-held mortgage notes through public auctions"  *Id.* at 93, 100.  In order to meet the requirements of the contract, "Hamilton reinforced its

capabilities by subcontracting with two nationally known concerns whose names spoke for themselves: Bell Laboratories (Bell Labs), a major scientific research facility, and the accounting firm of Coopers & Lybrand." *Id*. at 93-94.

Govplace's Supp. Mem. 10.   In *Ervin I*, Hamilton subcontracted Bell Labs to develop and implement an "optimization model," to maximize the yield of the auction sales.  298 F. Supp. 2d at 94.  For one of the sales, a temporary fix used by Bell Labs resulted in dropping one of the highest bidders.  *Id*. at 96–97.  A relator brought suit against Hamilton, claiming that Hamilton "act[ed] in reckless disregard of the truth or falsity of the auction optimization results."  *Id*. at 100.  The court granted in part Hamilton's motion for judgment, since Hamilton's reliance on Bell Labs did not satisfy the "knowing" requirement of a claim under the FCA:

> [I]t was…not negligent in the extreme, if negligent at all, for Hamilton to rely on an organization like Bell Labs and forego attempts to further test Bell Labs / Schindler's temporary fix.  Proof of reckless disregard requires much more than errors, even egregious errors.  Hamilton, due to the complexity of the pioneer, massive, and time-sensitive note sale transaction, subcontracted the work of developing an optimization formula to a prestigious scientific laboratory and the task of operating the auction itself to Coopers & Lybrand, a major financial services firm.

*Id*. at 101.  Govplace argues that its reliance on a large IT provider like Ingram Micro to certify that its products met federal contracting requirements was, similarly, not negligent in the extreme.  Govplace's Supp. Mem. 11–12.

Folliard draws a distinction between the case relied on by Govplace—*Ervin I*—and the same court's subsequent determination in *Ervin II*.  Folliard draws attention to the following language from *Ervin II*:

> In *United States ex rel. Compton v. Midwest Specialists, Inc*., 142 F.3d 296 (6th Cir. 1998), the United States Court of Appeals for the Sixth Circuit held that a supplier "knowingly" made a false claim to the government, where the supplier delivered goods to the government knowing the goods had not been tested and without knowing de facto whether the goods otherwise conformed to specifications.  *Id*. at 303-04.  Analogously, here Hamilton "knowingly" made a false claim to the government, where it delivered the results of the North and

Central optimization sale to the government, knowing that it had not consulted the key players involved in the previous sale to ensure that any problems with the West of Mississippi sale were resolved prior to the North and Central sale and without knowing de facto whether the optimization model otherwise conformed to HUD's specifications. *See also Larry D. Barnes, Inc. v. United States*, 45 Fed. Appx. 907, 914 (Fed. Cir. 2002) (holding that contractor's submission of an ordinary change order claim was reckless under the FCA because the contractor failed to verify the claim's underlying assumptions); *United States v. Cabrera–Diaz*, 106 F. Supp. 2d 234, 238–39 (D. Puerto Rico 2000) (holding that the defendant's billing secretary's failure to document time charges for anesthesiology services before submitting Medicare reimbursement claims was reckless under the FCA); *Krizek*, 111 F.3d at 942 (holding that physician's "shoddy recordkeeping," which led to inflated Medicare reimbursement claims, was reckless under § 3729(b)).

*United States ex rel. Ervin & Assocs. v. Hamilton Sec. Group* ("*Ervin II*"), 370 F. Supp. 2d 18, 42 (D.D.C. 2005). The court in *Ervin II* found that Hamilton's failure "to make simple inquires which would [have] alerted Hamilton that there was a problem" with the sub-contractor's optimization model constituted "gross negligence plus." *Id*.

Putting aside the possibly contradictory price sheets Govplace received, the Court finds that this case is analogous to *Ervin I*, not *Ervin II*. Folliard argues that the facts are dissimilar to *Ervin I* because "GovPlace did affirmatively represent to the Government that it would only supply TAA-compliant products when it completed its TAA certification." Rel.'s Supp. Mem. 9. This argument misses the mark. As stated by Folliard himself, "the *Ervin I* defendant did not have the requisite intent because the defendant apparently did not affirmatively represent that it would verify the results of the sub-contractor's work." *Id*. at 7 (citing *Ervin I*, 298 F. Supp. 2d at 101). Similarly, while Govplace told the government that it would supply TAA-compliant products, Govplace did not affirmatively represent that it would verify the county of origin information provided by its sub-contractor, Ingram Micro.

Furthermore, the government may have acquiesced to Govplace's sub-contractor relationship with Ingram Micro. From 2003 to 2009, the GSA conducted annual "Contractor

Administrative Visits" to evaluate Govplace's compliance with GSA Schedule Contract requirements. *See* Govplace SUF ¶ 13. During these visits, GSA reviewed Govplace's orders and invoices, and Govplace illustrated the process by which Govplace received and relied upon country of origin information provided by Ingram Micro. *Id*; Robinson Dep. 35:11–36:16. For each year except 2007, the GSA issued an Administrative Report Card. Govplace SUF ¶ 13. Each time Govplace received feedback from the GSA, the GSA found that Govplace demonstrated compliance with the TAA. *Id* ¶¶ 13–14. This may suggest that the government, aware of Govplace's sub-contractor relationship with Ingram Micro, approved of Govplace relying on Ingram Micro's representations; or at least that the government did not require Govplace to independently verify each of Ingram Micro's country of origin claims.

Folliard also argues that the facts are "more similar to *Ervin II*" because "in the instant case GovPlace 'failed to make simple inquires' that would have prevented the sale of non-TAA-compliant goods to the federal government." Rel.'s Supp. Mem. 9. "Because GovPlace had a non-delegable duty to provide the Government with TAA-compliant goods," Folliard argues that Govplace could not rely solely on the representations made by Ingram Micro and "retained the obligation to verify the veracity of general statements contained in a sales email." *Id*. at 10. These "simple inquires" would have consisted of Govplace directly reviewing the country of origin information provided by HP. *See id.* at 10–12. However, absent some reason to question Ingram Micro's representations, it was not gross negligence-plus for Govplace not to separately certify that the products were TAA-compliant. Govplace inquired into Ingram Micro's procedures for certifying product lists, and after reviewing Ingram Micro's practices, decided to partner with Ingram Micro. *See, e.g.*, Robinson Dep. 30:12–19 ("When Govplace was assessing working with Ingram Micro as our source for TAA compliance information, among other things,

in support of our government contract program, we spent quite a lot of time with Ingram Micro working to understand the underlying processes and procedures and strategies that they used to be able to ensure TAA compliance."). Govplace is not required, after concluding its "due diligence process with Ingram Micro," *id* at 32:19–20, to recheck all of Ingram Micro's subsequent representations. If Govplace had such a duty, it would undermine the beneficial effects of the partnership—Govplace could no longer leverage Ingram Micro's greater resources, as Govplace would have to redo all the certification checks done by Ingram Micro.

### 4.     *Govplace's Reliance on Ingram Micro Continued to be Reasonable Even After Govplace Received HP Product Lists from Other Sources*

Second, the Court will consider whether it was gross negligence-plus, deliberate ignorance, or reckless disregard for Govplace not to verify Ingram Micro's representations after receiving possibly contradictory information. The preceding discussion assumed that Govplace would not have had any particular reason to question Ingram Micro's certifications. However, if Govplace had reason to believe that Ingram Micro was wrong, ignored that information, and continued to rely on Ingram Micro, then Govplace might have been deliberately ignorant of the truth of its TAA compliance. In order to determine whether Govplace acted "knowingly," the Court must consider the content and context of the possibly inconsistent information.

During the period of limited discovery, Govplace found an email from an HP employee, dated August 27, 2007. *See* Ex. 10 to Rel.'s Supp. Mem. The email had an attachment, titled "IPG TAA compliant products1.xls," listing products and countries of origin. This list includes information about Q5983A. *Id.*[4] According to the list, product Q5983A was produced in Japan

---

[4] Govplace claims that the list included two relevant product numbers, Q5403A and Q5983A, and that the attachment shows that Q5403A was made in the United States, Japan, and China. Govplace's Supp. Mem. 14–15. However, the version of the email and attachment provided by Folliard only includes the cells for Q5983A, and Folliard's argument about this product list only pertains to Q5983A. *See* Ex. 10 to Rel.'s Supp. Mem.; Rel.'s Supp. Mem. 11.

and China.  *Id*.  Folliard argues that this shows that a disputed product was produced in China, a non TAA-compliant country, and therefore Govplace's continued reliance on Ingram Micro's country of origin certifications was reckless.  Rel.'s Supp. Mem. 10–12.  However, there are several problems with this argument.  First, Govplace received this information *after* the alleged sales of Q5983A took place.  Therefore, Folliard cannot use this to show that Govplace acted knowingly, at the time of sale, for product number Q5983A.  Second, this information does not seriously undermine Ingram Micro's representations.  The list shows that while some versions of Q5983A were made in China, it had a version made in a TAA-compliant country.  In fact, some of the Japanese made products listed are called the "U.S. Pub Sector/GOV-US" version— indicating that while certain versions are made in China, the products intended for the public sector were made in a TAA-compliant country.[5]  *See* Ex. 10 to Rel.'s Supp. Mem.  Therefore, the Court finds that, given the content of this HP email, it was not reckless or deliberately ignorant for Govplace to continue to rely on Ingram Micro's country of origin representations.

Govplace also produced several unsolicited price lists it received, from January 2006 through September 2007, from Tech Data.  *See* Exs. 7A–7E to Rel.'s Supp. Mem.  According to Govplace, "Tech Data is a competitor of Ingram Micro and presumably sent these price lists to Govplace in an effort to solicit its business."  Govplace's Supp. Mem. 15; *see also* Robinson Aff. ¶ 17.  As characterized by Folliard, these lists from Tech Data "show[] critical inconsistencies regarding the origin of the disputed products."  Rel.'s Supp. Mem. 10.  Folliard continues:

> At least two of the disputed products (AG052A and 416577-B21) appear both on Ingram Micro's charts and TechData's charts, yet the two sources show different countries of origin.  (Compare *e.g.* Exhibit 7A to Exhibit 8A, and Exhibit 7D to Exhibit 8D; see also Exhibit 9)  For instance, Product AG052A is listed in Ingram Micro's charts as originating in the United States, but it is listed in TechData's charts as originating in China.  (*Id*.)  Similarly, Ingram Micro lists Product 416577-B21's country of origin as being the United States, but TechData lists

---

[5] All of these arguments would pertain equally to product number Q5403A.

> China, Costa Rica, the Philippines, and Malaysia as being the countries of origin
> for this same product.  (*Id.*)

Rel.'s Supp. Mem. 10–11.  Folliard argues that this shows that Govplace deliberately ignored

conflicting data, and its continued reliance on Ingram Micro's certifications was reckless in light

of this contradictory information.  *Id.*

There are several problems with this argument. There is no indication that Govplace ever

read or even opened these price lists.  Govplace claims that "[b]ecause of Govplace relationship

with Ingram Micro and its participation in the GSA Pass Through Program, Govplace had no

need for Tech Data's unsolicited information and disregarded it."  Govplace's Supp. Mem. 15

(citing Robinson Aff. ¶ 17).  Folliard provides no evidence—such as an email from a Govplace

employee forwarding or commenting on a Tech Data list—that would show Govplace actually

read these price lists.  However, even if the Court assumes that Govplace opened and read the

attachments, there is a more serious problem.  The Tech Data price lists, on their face, disclaim

their reliability.  Each price list contains a disclaimer stating:

> ***Products quoted*** were selected by Tech Data based on specifications available at
> the time of the quotation, and ***are not guaranteed to meet bid specifications***.
> Product specifications may be changed by the manufacturer without notice.  ***It is
> your responsibility to verify product conformance to specifications of any
> subsequent contract.***  All products are subject to availability from the
> manufacturer.  ***Tech Data is not responsible for compliance with regulations,
> requirements or obligations associated with any contract resulting from this
> quotation*** unless said regulations, requirements or obligations have been passed to
> Tech Data and approved in writing by an authorized representative of Tech Data.

*See, e.g.*, Ex. 7A to Rel.'s Supp. Mem. (at GP004662) (emphasis added).  This stands in stark

contrast to the express language included in several of Ingram Micro's transmittal emails:

> Ingram Micro passes through the following manufacturer certifications:
> …***Products offered by the manufacturer are compliant with the Trade
> Agreements Act***."

See Exs. C & D to Govplace's Mot. Summ. J. (emphasis added).  Must Govplace, after receiving unsolicited price lists from a company with which it does not do business—lists that explicitly disclaim any representations about meeting bid specifications—now question the certified representations of its longtime partner?  The answer is no.  Assuming Govplace read the Tech Data price lists, it was neither extreme negligence, nor deliberate ignorance, nor reckless disregard of the truth to continue relying on country of origin information provided by Ingram Micro.  These Tech Data lists cannot show that Govplace "knowingly" submitted false claims.

When the Court considers the evidence offered by Folliard, accepts it as true, and draws all reasonable inferences in favor of Folliard, the Court finds that Folliard could not convince a reasonable jury that Govplace "knowingly" submitted false claims.  After an appropriate time for discovery, Folliard apparently cannot introduce any evidence that would create an inference of knowing fraud by Govplace, or raise a genuine issue of material fact precluding resolution at this stage.  Therefore, the Court will enter summary judgment for Govplace as to the remaining four product numbers, and dismiss Folliard's action with prejudice.

## IV.    CONCLUSION

The Court has strong doubts that Folliard can prove that Govplace made a false claim.  To show that Govplace violated the TAA, Folliard introduces a report and declaration from an expert that presents two problems.  First, as a declaration made "to the best" of the declarant's knowledge, it may not count as a declaration made pursuant to "personal knowledge," per Federal Rule of Civil Procedure 56(c)(4).  Second, the report relies on information received via FOIA requests, and discovery produced in connection with prior litigation.  As such, Folliard might rest an essential element of his claim on publicly available information for which he is not the original source; if so, the Court may lack jurisdiction over his claims.

Folliard's evidence cannot support a finding that Govplace acted "knowingly."  Folliard does not contest Govplace's claim that it relied on Ingram Micro's country of origin representations.  Folliard does not dispute that, at the time of the disputed sales, Ingram Micro represented to Govplace that the products in dispute were TAA-compliant.  Instead, Folliard argues that Govplace acted in reckless disregard of the truth because Govplace did not independently verify the country of origin information for each of the products.  Folliard argues that Govplace "stuck its head in the sand" because Govplace did not question the certifications provided by Ingram Micro based on information in unsolicited product lists.

In order for Govplace's actions to be "knowing," mere negligence or even gross negligence is not enough.  Based on the evidence provided by Folliard, Govplace's actions cannot amount to gross negligence plus, deliberate ignorance, or reckless disregard.  As a small business, Govplace leveraged the greater resources of Ingram Micro to certify that the thousands of products offered for sale met the various requirements for government contracts.  Even after receiving the conflicting product lists from other companies, Govplace did not act in reckless disregard of the truth by continuing to rely on Ingram Micro's representations, given the nature of the information Govplace received from other sources.

In order for his "*qui tam* FCA action to survive summary judgment," Folliard "must provide sufficient evidence to support an inference of knowing fraud."  *Odebrecht*, 297 F. Supp. 2d at 277–78.  He has failed to do so, and therefore Govplace is entitled to summary judgment on the remaining disputed sales and product numbers.  After resolving these maters, this disposes of all of Folliard remaining claims.  Therefore, the Court will dismiss this case with prejudice.

A separate Order consistent with Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on March 18, 2013.